## STATE OF CONNECTICUT *v.* GORDON C. RANDOLPH
## (SC 17352)

Rogers, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.*

reserved. The trial judge shall file the decision on the motion with the appellate clerk. . . ."

\* This case originally was argued before a panel of this court consisting of Justices Borden, Norcott, Katz, Palmer and Vertefeuille. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Chief Justice Rogers and Justice Zarella were added to the panel, and they have read the record, briefs and transcript of the oral argument.

Argued January 10—officially released November 13, 2007

*Jeremiah Donovan,* for the appellant (defendant).

*Mitchell S. Brody,* senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Sandra Tullius,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Gordon C. Randolph, directly appeals[1] from the judgments of conviction, rendered after a jury trial, of one count of felony murder, two counts of robbery in the first degree, one count of conspiracy to commit robbery in the first degree and one count of criminal possession of a firearm. The defendant claims that the trial court improperly: (1) consolidated two separate cases against him for trial and instructed the jury that the evidence in each case was cross admissible to establish " 'a characteristic method in the commission of criminal acts' "; (2) denied the defendant's request to waive his presence at the probable cause hearing; (3) admitted a postmortem report at the defendant's probable cause hearing in violation of the confrontation clauses of the federal and state constitutions; (4) denied the defendant's motion to suppress certain eyewitness identifications; and (5) denied the defendant's motion for a mistrial and motion for a new trial because the state, without prior notice to the defendant, elicited in-court identifications from two eyewitnesses who previously had not identified the defendant as the perpetrator of the crimes. Additionally, the defendant claims that the prosecutor improperly introduced facts not in evidence during his closing argument, thereby depriving the defendant of his due process right to a fair trial. We agree with the defendant's first claim and, therefore, reverse the judgments of the trial court.[2]

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] We also address the merits of the defendant's second, third and fourth claims because these issues are likely to arise on remand.

In connection with two separate incidents, the defendant was charged in two informations. In the first information, the defendant was charged with robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (4). In the second information, the defendant was charged with felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of § 53a-134 (a) (2) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The first information pertained to an armed robbery that had occurred on December 17, 2001, at a Burger King restaurant located at 914 New Britain Avenue in the city of Hartford (Burger King case). The second information pertained to an armed robbery that had occurred on March 23, 2002, at Empire Pizza, a restaurant located at 861 New Britain Avenue in the city of Hartford (Empire Pizza case). The trial court consolidated the two cases against the defendant for trial, and the jury found the defendant guilty of all charges. Thereafter, the defendant moved for a new trial, claiming, in part, that the trial court improperly had consolidated the two cases against him for trial. The trial court denied the motion and rendered judgments of conviction in accordance with the jury's verdict. This appeal followed.

The jury reasonably could have found the following facts regarding the first information. On December 17, 2001, at approximately 6:30 p.m., two masked and armed men dressed in dark clothing entered a Burger King restaurant located at 914 New Britain Avenue in Hartford. The first gunman, whom witnesses described as short, heavyset and Hispanic, guarded the door to the restaurant while the second gunman, whom witnesses described as short, slender and African-American, jumped behind the counter and instructed the employ-

ees to empty the contents of the cash registers into a black backpack. After the cash registers had been emptied, the African-American gunman ordered the assistant manager of the restaurant, Julissa Chaparro, to "take [him] to the safe." Chaparro led the gunman to the manager's office where the safe was located and emptied the contents of the safe as instructed. As she did so, the gunman repeatedly apologized and said, "I wish I didn't have to do this to you." Once the safe was empty, both gunmen fled the restaurant and Chaparro contacted the police.

Thereafter, Daniel Goicochea, a patrol officer with the Hartford police department, received a dispatch informing him of the robbery. He recalled that a vehicle suspected to have been involved in multiple robberies in the surrounding area had been missing from its typical location on Grafton Street earlier in the evening. Goicochea drove in the direction of Grafton Street to determine whether the vehicle had returned. On his way to Grafton Street, Goicochea spotted the vehicle driving in front of him and began to follow it. The driver of the vehicle parked in front of a residence located at 66 Grafton Street and two men matching the descriptions of the perpetrators of the Burger King robbery exited the vehicle. Goicochea instructed the two men to stop and, in response, they immediately fled north on Grafton Street. Goicochea pursued the two men and successfully apprehended Eliseo Bennett, who matched the description of the short, heavyset, Hispanic gunman. Bennett, who had an air pistol in his possession, was arrested and charged with robbery in the second degree in connection with the Burger King robbery. Bennett subsequently confessed to his participation in the robbery and informed the police that the defendant, also known as "P.O.," was the other gunman.

The jury reasonably could have found the following facts regarding the second information. On March 23,

2002, at approximately 9:30 p.m., a lone masked gunman dressed in dark clothing entered the Empire Pizza restaurant located at 861 New Britain Avenue in Hartford. The gunman went behind the counter and repeatedly ordered the co-owner of the restaurant, Antonios Antonaras, to "give [him] the money." Antonios Antonaras opened the cash register, and told the gunman to "[t]ake the money and go." As the gunman was emptying the cash register, Victor Arce, an employee of Empire Pizza, attempted to subdue him physically. A struggle ensued, and the gunman shot Arce in the chest and abdomen, wounding him fatally. The gunman then fled on foot while Tammy Antonaras (Antonaras), the co-owner of the restaurant, and Wanda Carrasquillo, an eyewitness who was situated outside of the restaurant, each contacted the police. Antonaras, who had made eye contact with the gunman briefly during the robbery, described him as African-American, between five feet, two inches tall and five feet, five inches tall, and weighing about 150 or 160 pounds. Carrasquillo, who had seen the gunman flee the restaurant, described him as African-American, approximately five feet, three inches tall and weighing about 130 pounds. Both Antonaras and Carrasquillo later identified the defendant as the gunman. Additional facts will be set forth as necessary.

I

WHETHER THE TRIAL COURT IMPROPERLY CONSOLIDATED THE BURGER KING AND EMPIRE PIZZA CASES FOR TRIAL

The defendant first claims that he was substantially prejudiced by the trial court's consolidation of the Burger King and Empire Pizza cases for trial because the jury improperly was permitted to consider the evidence adduced in each case while deliberating on the defendant's guilt in the other if it found that the evidence established " 'a characteristic method in the commis-

sion of criminal acts.' " The state responds that the trial court properly permitted the jury to consider the evidence in both the Burger King and Empire Pizza cases cumulatively if it found that the evidence established a common scheme or plan, but, even if it did not, the evidentiary impropriety was harmless. We agree with the defendant and, therefore, reverse the judgments of the trial court.

The following additional facts and procedural history are necessary for our resolution of this claim. Prior to trial, the defendant moved to sever, and the state moved to consolidate, the Burger King and Empire Pizza cases for trial. At the hearing on the parties' motions, the state claimed that, if the cases were to be tried separately, evidence in one case would be admissible in the trial of the other to establish that the defendant had a common scheme or plan to rob fast-food restaurants located on New Britain Avenue. The state therefore claimed that separate trials would afford the defendant no significant benefit, and that consolidation was appropriate. Alternatively, the state claimed that consolidation was appropriate under *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987), because the two cases involved discrete and easily distinguishable factual scenarios. The defendant responded that the evidence in the two cases lacked sufficient similarity to be cross admissible under the common scheme or plan exception, and that it would be prejudicial to consolidate the two cases for trial in light of the violent manner in which the Empire Pizza robbery had been committed. At the conclusion of the hearing, the trial court granted the state's motion for consolidation and denied the defendant's motion for severance.

In its final charge to the jury, the trial court issued the following relevant instruction: "Now, while you must separately consider each charge, you may, as you deliberate on the two separate charges, consider the evi-

dence of the one charge in the case of the other for the sole purpose, if you find that it is credible to do so, as to whether or not it establishes a characteristic method in the commission of criminal acts. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity.

"You may consider the evidence of one case in the other case solely for the purpose of whether or not it establishes a characteristic method in the commission of criminal acts and you may only do that if you believe the evidence and, further, find it logically, rationally, and conclusively supporting the issue for which it is being offered, but only, as I said, as it may bear on the issue of a characteristic method of criminal acts.

"On the other hand, if you do not believe such evidence or, even if you do, if you find that it does not logically, rationally, and conclusively support the issues for which it is being offered, then you may not consider the testimony in the other case.

"You may not, just because you are convinced beyond a reasonable doubt that the crime charged in one case, use that conclusion to find that the defendant is a bad person; and, therefore, more likely to have committed the crime charged in the other case. That you may not do." At the conclusion of the trial court's charge, the defendant took exception to this instruction.

The principles that govern our review of a trial court's ruling on a motion for joinder or a motion for severance are well established. "General Statutes § 54-57 provides: Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise. See also Practice Book § 41-19 ([t]he judicial authority may, upon its own motion or the

motion of any party, order that two or more informa-
tions, whether against the same defendant or different
defendants, be tried together). In deciding whether to
sever informations joined for trial, the trial court enjoys
broad discretion, which, in the absence of manifest
abuse, an appellate court may not disturb. . . . The
defendant bears a heavy burden of showing that the
denial of severance resulted in substantial injustice, and
that any resulting prejudice was beyond the curative
power of the court's instructions. . . .

"Where evidence of one incident can be admitted at
the trial of the other, separate trials would provide the
defendant no significant benefit. It is clear that, under
such circumstances, the defendant would not ordinarily
be substantially prejudiced by joinder of the offenses
for a single trial. . . .

"Substantial prejudice does not necessarily result
from a denial of severance even where evidence of one
offense would not have been admissible at a separate
trial involving the second offense. . . . Consolidation
under such circumstances, however, may expose the
defendant to potential prejudice for three reasons: First,
when several charges have been made against the defen-
dant, the jury may consider that a person charged with
doing so many things is a bad [person] who must have
done something, and may cumulate evidence against
him . . . . Second, the jury may have used the evi-
dence of one case to convict the defendant in another
case even though that evidence would have been inad-
missible at a separate trial. . . . [Third] joinder of
cases that are factually similar but legally unconnected
. . . present[s] the . . . danger that a defendant will
be subjected to the omnipresent risk . . . that
although so much [of the evidence] as would be admissi-
ble upon any one of the charges might not [persuade
the jury] of the accused's guilt, the sum of it will con-
vince them as to all. . . .

"Despite the existence of these risks, this court consistently has recognized a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion . . . will not second guess the considered judgment of the trial court as to the joinder or severance of two or more charges." (Citations omitted; internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 519–21, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

"The court's discretion regarding joinder, however, is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. Consequently, we have identified several factors that a trial court should consider in deciding whether a severance may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 375, 852 A.2d 676 (2004); see also *State* v. *Boscarino*, supra, 204 Conn. 722–24.

A

Admission of Evidence of Uncharged Misconduct
to Establish Common Scheme or Plan

We first address the defendant's claim that the trial court improperly consolidated the Burger King and Empire Pizza cases for trial because it improperly concluded that the evidence in each case was admissible in the trial of the other to establish a common scheme or plan. As previously explained, if evidence of a defen-

dant's uncharged misconduct is cross admissible to establish a common scheme or plan, then separate trials ordinarily would afford the defendant no significant benefit and the trial court's joinder of the offenses for a single trial will not result in substantial prejudice. See, e.g., *State* v. *McKenzie-Adams*, supra, 281 Conn. 527 (trial court properly consolidated cases because "if the cases . . . had been tried separately, evidence of the defendant's sexual misconduct with each victim would have been admissible to establish a common scheme or plan in the case of the other"); *State* v. *Greene*, 209 Conn. 458, 464, 551 A.2d 1231 (1988) ("[t]he trial court properly joined the two cases for trial because, in the event of separate trials, evidence relating to each of the cases would have been admissible in the other"); *State* v. *Pollitt*, 205 Conn. 61, 68, 71–72, 530 A.2d 155 (1987) (trial court properly consolidated cases because evidence of defendant's uncharged misconduct would have been admissible to prove identity).

Before addressing the merits of the defendant's claim, we review our jurisprudence regarding the admissibility of evidence of uncharged misconduct. Such evidence generally is inadmissible, unless it falls within a well established evidentiary exception. See Conn. Code Evid. § 4-5 (b)[3] ("[e]vidence of other crimes, wrongs or

---

[3] Section 4-5 of the Connecticut Code of Evidence provides: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(c) Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony").

"As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of the evidence must outweigh its prejudicial effect." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, supra, 281 Conn. 521–22; accord Conn. Code Evid. § 4-5. "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 661, 835 A.2d 895 (2003).

The standard by which the admissibility of evidence of uncharged misconduct is measured generally will depend on two factors: the purpose for which the evi-

dence is offered, and the type of crime with which the defendant has been charged. For example, when a defendant is charged with a sex crime and evidence of uncharged sexual misconduct is offered to establish that the defendant had a common scheme or plan to engage in sex crimes, the admissibility of the proffered evidence is evaluated pursuant to a liberal standard. See *State* v. *Sawyer*, 279 Conn. 331, 332 n.1, 904 A.2d 101 (2006) ("our holdings in sexual assault cases that prior sexual misconduct is viewed more liberally than other types of prior misconduct should not be disturbed"). In cases that do not involve sex crimes, such as the present case, however, we apply a more stringent standard to determine whether evidence of uncharged misconduct is admissible to establish a common scheme or plan. An examination of our case law reveals that, although this court recently and repeatedly has addressed the liberal standard of admissibility applicable to sex crime cases; see *State* v. *McKenzie-Adams*, supra, 281 Conn. 519–27; *State* v. *Aaron L.*, 272 Conn. 798, 819–28, 865 A.2d 1135 (2005); *State* v. *Ellis*, supra, 270 Conn. 352–68; *State* v. *James G.*, 268 Conn. 382, 388–402, 844 A.2d 810 (2004); *State* v. *Merriam*, supra, 264 Conn. 656–65; *State* v. *George B.*, 258 Conn. 779, 789–94, 785 A.2d 573 (2001); *State* v. *Kulmac*, 230 Conn. 43, 59–63, 644 A.2d 887 (1994); we have not had the opportunity to address the more stringent standard applicable to nonsex crime cases since *State* v. *King*, 235 Conn. 402, 405, 665 A.2d 897 (1995) (per curiam) (affirming judgment of Appellate Court on basis of that court's "thoughtful resolution of [the] issues"), and *State* v. *Greene*, supra, 209 Conn. 464–66, which was decided in 1988. A review of our case law further reveals that, although we have been consistent in our application of this stringent standard, we have been inconsistent in our articulation and explanation of the principles that guide our analysis. See *State* v. *Murrell*, 7 Conn.

App. 75, 83, 507 A.2d 1033 (1986) ("there is some discrepancy in the cases as to the factors governing the admissibility determination when evidence of prior misconduct is offered to prove a common scheme").

Accordingly, we take this opportunity to analyze carefully our jurisprudence concerning the admissibility of evidence of uncharged misconduct offered to establish the existence of a common scheme or plan in nonsex crime cases, and to clarify the principles that govern our review. We turn first to the general purpose and scope of the common scheme or plan exception. Evidence of uncharged misconduct, although inadmissible to prove a defendant's bad character or propensity to engage in criminal behavior, is admissible "[t]o prove the existence of a larger plan, scheme, or conspiracy, of which the crime on trial is a part." 1 C. McCormick, Evidence (6th Ed. 2006) § 190, pp. 754–55. To prove the existence of a common scheme or plan, each crime must be "an integral part of an overarching plan explicitly conceived and executed by the defendant or his confederates." Id., p. 755; see also C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.19.9, p. 237 ("The exception for common plan or scheme admits evidence of conduct that forms part of an overall plan. This exception requires that the misconduct be connected to a 'common' plan or scheme and not be isolated or unconnected conduct of a similar nature."). Evidence of such a plan is relevant to the charged crime because it bears on the defendant's "motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute." (Internal quotation marks omitted.) *State* v. *Shindell*, 195 Conn. 128, 133–34, 486 A.2d 637 (1985), quoting C. McCormick, Evidence (2d Ed. 1972) § 190, pp. 448–49; see also 1 E. Imwinkelried, Uncharged Misconduct Evidence (Rev. Ed. 1999) § 3:21, p. 114 ("[p]roof that the defendant entertained a plan, including the commission of the

charged crime, is logically relevant to show the defendant's identity as the criminal"); 1 E. Imwinkelried, supra, p. 115 (proof that defendant entertained plan logically relevant to demonstrate that "[t]he charged and uncharged crimes both are effects of the same cause, the plan").

In addition to these general principles, our analysis reveals the existence of two separate and distinct categories of cases in which we have applied the common scheme or plan exception. In the first category, which consists of what most accurately may be described as "true" common scheme or plan cases, the nature of the charged and uncharged crimes combined with connecting evidence, if any, gives rise to a permissive inference that an overall scheme or plan existed in the defendant's mind, and that the crimes were executed in furtherance of that plan. In the second category of cases, which consists of what most accurately may be described as "signature" cases, the charged and uncharged crimes appear to be separate and discrete criminal acts, but the method of commission exhibits the existence of a "modus operandi," "logo," or "signature," which, when considered in combination with other factors, such as the proximity of time and place of commission, gives rise to a permissive inference that the crimes were executed in furtherance of an overall common scheme or plan.

In the first category, which is composed of "true" common scheme or plan cases, the nature of the uncharged misconduct and the charged crime, or the existence of connecting evidence, reveal "a genuine connection between the crimes in the defendant's mind."[4] 1 E. Imwinkelried, supra, § 3:23, p. 124. As Pro-

---

[4] See State v. Johnson, 190 Conn. 541, 542, 461 A.2d 981 (1983) (evidence that defendant previously attempted to commit larceny by false promise admissible in defendant's trial on charge of larceny by false promise because both incidences arose within two months of each other and defendant had told both victims he knew man employed by mint who would sell him "seal"

fessor Edward J. Imwinkelried explains in his treatise entitled "Uncharged Misconduct Evidence": "The [uncharged] act can be probative of a true plan even when it is dissimilar to the charged crime. There need not be exact correspondence between all the crimes involved in the plan. The defendant's burglary of a pawn shop can be used to show the defendant's plan to obtain the weapons for a robbery. The defendant's theft of a car can be employed to show the defendant's plan to use the car as a getaway vehicle in a kidnapping or robbery. The defendant's theft of a uniform is evidence of the defendant's plan to masquerade as a guard in order to rob an armored car. The dissimilarity between the charged and uncharged crimes does not negate the

for truck with which he could "break the [original] seal, take off a few bags of money [destined for disposal] . . . reseal the truck with the newly purchased seal," and split proceeds with victim); *State* v. *Carrione*, 188 Conn. 681, 692, 453 A.2d 1137 (1982) (defendant charged with larceny by fraudulently inducing relatives and friends to invest money in undisclosed ventures that she represented would provide extremely high returns; at defendant's trial "testimony about later transactions with the defendant might well have been admitted . . . to show a common scheme to defraud the victims by inducing them to reinvest the returns she paid them along with additional sums of money"), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983); *State* v. *Nardini*, 187 Conn. 513, 518–19, 447 A.2d 396 (1982) (defendant charged with conspiracy to commit arson and arson in first degree; evidence that defendant previously had solicited others "to set fire to certain properties which he owned, including 778-780 George Street, the subject of the arson charged against him, and that he suggested a method of starting a fire similar to the one claimed to have been used to burn that property" was admissible to demonstrate "a common scheme on the part of the defendant to have his properties destroyed by fire in a manner similar to that used for the George Street building"); *State* v. *King*, 35 Conn. App. 781, 791–92, 647 A.2d 25 (1994) (evidence of defendant's theft of automobile and commission of robberies admissible to establish common scheme or plan because: automobile stolen in first robbery used in following two robberies; automobile subsequently found abandoned near apartment of defendant's girlfriend, "who had been ordered by the defendant to conduct the fourth robbery while he waited in an automobile outside" and who testified with respect to *"the interconnection of all of the robberies"*; all robberies "were generally similar in nature" [emphasis added]), aff'd, 235 Conn. 402, 665 A.2d 897 (1995) (per curiam).

value of the uncharged crime as evidence of the existence of the plan including the charged crime." Id., § 3:22, p. 118.

*State* v. *Shindell*, supra, 195 Conn. 128, exemplifies the first category of cases. In *Shindell*, the defendant was charged with two counts of arson in the second degree and two counts of conspiracy to commit arson in the second degree. Id., 129. "The four counts related to two fires, one on November 23, 1974, and the other on November 29, 1974, both of which occurred at 36-38 Ann Street in New Haven." Id. At the defendant's trial, the trial court admitted evidence of uncharged misconduct pertaining to the defendant's participation in other arsons, attempted arson, vandalism and filing of false insurance claims. Id., 133. Specifically, the trial court admitted evidence that the defendant had sold the Ann Street property, as well as five additional properties located in New Haven, in a single transaction to Peter Cappola, his coconspirator in the crimes charged. Id., 129–30. The defendant and Cappola entered into a sales agreement that contained a " 'windfalls profit clause' " that required them to share equally the insurance proceeds from the destruction of any of the buildings situated on the five properties. Id., 130. Upon realizing the extent to which the buildings were insured against vandalism, theft, fire and loss, the defendant and Cappola decided to destroy the buildings and recoup the insurance proceeds. From June through November, 1974, the defendant and Cappola, either personally or through their agents, intentionally vandalized and set fire to various properties, including 36-38 Ann Street, filed false insurance claims concerning those properties, and split the proceeds equally pursuant to the terms of the windfalls profit clause. Id., 130–33. Additionally, with respect to the remaining properties, the defendant and Cappola filed false insurance claims for vandalism, theft and loss of rents. Id., 132. The trial court admitted

the evidence of uncharged misconduct because it concluded that the evidence was "relevant to the defendant's motive, intent and involvement in a common plan or scheme." Id., 134.

On appeal to this court, the defendant claimed that the trial court's admission of uncharged misconduct evidence "amounted to an impermissible attack on his character in violation of his constitutional rights to due process and a fair trial." Id., 133. We disagreed, concluding that the trial court properly had admitted the evidence because it "was relevant and material to show a larger continuing plan, scheme, or conspiracy, of which the present crime[s] on trial [were] a part." (Internal quotation marks omitted.) Id., 136. In arriving at this conclusion, we noted that, "[a]ll the various properties involved were part of a single sales transaction, a package deal executed under a common sales agreement and subject to nearly identical mortgage terms. Insurance proceeds collected on losses to any of the buildings were divided pursuant to the same windfall profits arrangement. Each of the key participants in the various offenses played a role that remained constant throughout: the defendant advised Cappola, dealt directly with the appraiser, and filed and pressed the insurance claims; Cappola hired and instructed the actual perpetrators of the arsons and vandalism, set the scenes for the fires by strategically placing the gasoline in the buildings and signed the claims and letters prepared by the defendant. In addition, all the offenses occurred within less than a year, most within . . . six months." Id., 135–36.

The defendant claimed, however, that the evidence was inadmissible because it "lacked the requisite grade of similarity" to the charged crimes. (Internal quotation marks omitted.) Id., 134. We rejected this claim, noting that "the defendant misconstrues the specific basis upon which the trial court admitted this evidence. The

degree of similarity between the crime charged and the other crime is only at issue when the latter is an *unrelated incident which, because of certain particularly distinguishing features that it shares in common with the charged offense, is probative to show that the same individual committed both.* In such a case, the evidence is offered [t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. . . . [M]uch more is demanded [in cases involving unrelated incidents] than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. *The device used must be so unusual and distinctive as to be like a signature.*" (Emphasis added; internal quotation marks omitted.) Id., 134–35. Because the evidence of uncharged misconduct at issue in *Shindell*, did not consist of "unrelated incidents that could only be connected to the charged crimes by showing a high degree of similarity in the modus operandi of their commission"; id., 135; but, rather, exhibited a "substantial number of . . . [connecting] factors" indicating the existence of a common scheme or plan to commit insurance fraud, we concluded that the admissibility of the evidence did not depend on the degree of similarity shared by the charged and uncharged crimes.

In the second category, which consists of signature cases, this court concluded that evidence of uncharged misconduct was admissible to establish the existence of a common scheme or plan because the factual characteristics shared by the charged and uncharged crimes were "sufficiently distinctive and unique as to be like a signature" and, therefore, it logically could be inferred that "if the defendant is guilty of one [crime] he must be guilty of the other."[5] (Internal quotation marks omitted.)

---

[5] See *State* v. *Greene*, supra, 209 Conn. 465–66 (if robbery cases had been tried separately, evidence of each robbery would have been admissible in trial of other to establish common scheme or plan because "[t]he robberies were committed by nearly identically dressed men, using identical weapons, robbing similar establishments at similar times of day within three days of

*State* v. *Jones*, 205 Conn. 638, 661, 534 A.2d 1199 (1987) (evidence of prior burglary and robbery admissible in defendant's felony murder trial to establish common scheme or plan because crimes were proximate in place and time, same perpetrators were involved, all victims were highly vulnerable, and excessive violence was used).

*State* v. *Mandrell*, 199 Conn. 146, 506 A.2d 100 (1986), is illustrative of the second category of cases. In *Mandrell*, the defendant was charged in relevant part with robbery in the first degree and assault of a victim sixty years or older in the second degree. Id., 147. The charges arose out of an incident in which the defendant and an accomplice had robbed a liquor store located at 350 Asylum Avenue in Hartford. Id., 148. In the commission of the robbery, the defendant's accomplice threatened the clerk of the store with what the clerk believed to be a gun, forced the clerk to lay down on the floor in the back room, and bound and gagged him. Id. There-

each other and in the same vicinity"); *State* v. *Braman*, 191 Conn. 670, 678, 469 A.2d 760 (1983) (evidence of prior robbery admissible to establish common scheme or plan in defendant's robbery trial because "[b]oth establishments were bars; the bars were located in adjoining towns; two persons participated in each robbery; the weapons used in each were a shotgun with cut-down configuration and a small automatic pistol; in both instances the robber with the shotgun assumed the leadership role; the employees and patrons in each instance were ordered into back rooms of each bar; and the incidents were close in point of time"); *State* v. *Barnes*, 132 Conn. 370, 373, 44 A.2d 708 (1945) (evidence of robbery of fur coat admissible in defendants' trial on charge of conspiracy to steal fur coats because two "situations might almost be described as identical"; two hours after charged offense same four defendants entered fur store in New Haven and attempted to steal fur coat in same manner as charged offense); cf. *State* v. *Weidenhof*, 205 Conn. 262, 273 n.7, 533 A.2d 545 (1987) (Declining to address the defendant's evidentiary claim, but noting that "[a]mong the legitimate purposes [for the admission of evidence of uncharged misconduct] is the use of such testimony to establish identity through a common plan or design. Reliance on a common plan or design requires the state to show, however, that earlier incidents and the crime presently charged are sufficiently distinctive and unique as to be like a signature." [Internal quotation marks omitted.]).

after, the defendant, who had attempted to open the cash register unsuccessfully, ordered his accomplice to unbind the clerk and return him to the front of the store. The defendant, gesticulating wildly and using profanity, forced the clerk to open the cash register. The clerk subsequently was escorted to the back room, where he was bound and struck in the head twice with a bottle. Id., 148–49. At the defendant's trial, the state sought to introduce testimony concerning a robbery that the defendant had committed five years prior to the crimes charged. The evidence established that the defendant and an unidentified accomplice previously had robbed a liquor store located at 280 Asylum Avenue in Hartford. Id., 150. During that robbery, the defendant had grabbed a customer by the neck, put a gun to the customer's head and assaulted the customer physically, while the defendant's accomplice forced the clerk to open the cash register. The defendant, while using profanity, then forced the customer and the clerk to lie down on the floor of the back room, where the defendant struck the clerk in the head twice with a bottle. Id., 150–51. The trial court admitted the evidence of uncharged misconduct to prove, inter alia, the existence of a common scheme or plan. Id., 151.

On appeal to this court, the defendant claimed that the trial court improperly had admitted the evidence concerning the defendant's uncharged misconduct. Id., 150. In addressing this claim, we noted that, "[e]vidence of other crimes is relevant to identity, a common scheme, or an element of the crime presently charged, if the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. Much more is required than the fact that the offenses fall into the same class. The device used must be so unusual and distinctive as to be like a signature. *State* v. *Ibraimov*, [187 Conn. 348, 354, 446 A.2d 382 (1982)]." (Internal quotation marks

omitted.) *State* v. *Mandrell,* supra, 199 Conn. 151–52. With this standard in mind, we examined the factual similarities shared by the charged and uncharged crimes: "both robberies took place in liquor stores located close to each other on Asylum Street in Hartford and were committed by two black males. In each robbery the defendant was identified as using profanity and exhibiting aggressive, violent behavior, the store clerk was forced to lie down on the floor in the store's back room and the clerk was twice struck on the head with a liquor bottle." Id., 152. We also noted the dissimilarities between the charged and uncharged crimes: a gun was displayed openly in the uncharged robbery only; the two robberies were committed at different times of day and five years apart (although the defendant was incarcerated during much of this time period); bottles of different sizes were used to strike each clerk in the head. Id. Despite these dissimilarities, we concluded that the trial court properly had admitted the evidence of uncharged misconduct to establish the existence of a common scheme or plan because "the methods used in the two crimes were sufficiently similar and unique to warrant a reasonable inference that the defendant committed both crimes." Id.

We never previously have articulated why we employ the "signature test," which is probative of the identity of the defendant as the perpetrator of the crime charged, to ascertain the existence of a common scheme or plan.[6] See *State* v. *Ibraimov,* supra, 187 Conn.

[6] Indeed, it appears that our use of the signature test in the context of the common scheme or plan exception originally was inadvertent. For example, in *State* v. *Mandrell,* supra, 199 Conn. 151, the evidence of uncharged misconduct had been admitted not only to prove the existence of a common scheme or plan, but also to prove: (1) intent; (2) an element of the crime charged; and (3) the identity of the perpetrator. In analyzing the admissibility of the evidence, we broadly observed that, "[e]vidence of other crimes is relevant to *identity,* a *common scheme,* or an *element of the crime presently charged,* if the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. Much more is required than the fact that the offenses

354 ("Evidence of other crimes or misconduct of an accused is admissible on the issue of *identity* where the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. Much more is required than the fact that the offenses fall into the same class. *The device used must be so unusual and distinctive as to be like a signature*." [Emphasis added; internal quotation marks omitted.]). Accordingly, we take this opportunity to do so.

The signature test ordinarily is used to determine whether evidence of uncharged misconduct is admissible under an evidentiary exception separate and distinct from the common scheme or plan exception, namely, the identity exception. See Conn. Code Evid. § 4-5 (b). Specifically, the test is used to discern whether evidence of uncharged misconduct is admissible to prove the identity of the defendant as the perpetrator of the crime charged. See, e.g., *State* v. *Payne*, 219 Conn. 93, 100, 591 A.2d 1246 (1991); *State* v. *Sierra*, 213 Conn. 422, 430, 568 A.2d 448 (1990).

fall into the same class. The device used must be so unusual and distinctive as to be like a signature." (Internal quotation marks omitted.) Id., 151–52. In support of this proposition, we cited *State* v. *Ibraimov*, supra, 187 Conn. 354, in which evidence of uncharged misconduct had been admitted solely to prove the *identity* of the perpetrator of the crime charged. Thereafter, in subsequent common scheme or plan cases, we continued to rely on the signature test, without explanation, citing *Mandrell*. See *State* v. *Greene*, supra, 209 Conn. 465–66 (concluding that evidence was cross admissible because factual similarities compare favorably to *Mandrell* and *State* v. *Braman*, 191 Conn. 670, 678, 469 A.2d 760 [1983]); *State* v. *Jones*, supra, 205 Conn. 661 (applying signature test to assess admissibility of evidence of uncharged misconduct evidence and citing, inter alia, *Mandrell* and *State* v. *Crosby*, 196 Conn. 185, 191, 491 A.2d 1092 [1985] [identity case]); but see *State* v. *Braman*, supra, 677–78, 681 (using signature test to assess admissibility of evidence of uncharged misconduct offered to prove identity; noting that evidence also was admissible to establish common scheme or plan because state had presented evidence of defendant's advance preparation to commit crime).

The signature test is pertinent to the common scheme or plan inquiry, however, when the state seeks to establish the existence of an overall plan in the defendant's mind based *solely* on the similarities shared by the charged and uncharged crimes. This is because, when evidence of uncharged misconduct is sufficiently similar to the charged crime so as to rise to the level of a signature, modus operandi, or logo, it also is likely to exhibit "such a concurrence of common features . . . [as] naturally to be explained as caused by a general plan of which [the charged and uncharged crimes] are the individual manifestations." 2 J. Wigmore, Evidence (Chadbourn Rev. Ed. 1979) § 304, p. 249; see also *State* v. *Murrell*, supra, 7 Conn. App. 88 ("[w]here evidence of prior misconduct is sufficiently similar to the facts and circumstances of the charged offense to be admissible for the purpose of proving that the same individual committed both crimes, i.e., to be admissible under the identity exception, then there is some likelihood that the evidence is also relevant and admissible for the purpose of proving a common scheme or system of criminal activity"). Stated another way, when the charged and uncharged crimes exhibit the same modus operandi, it is likely that both crimes had been committed in furtherance of an overall plan or scheme in the defendant's mind. It is the existence of this permissive inference that an overall plan existed that explains our use of the signature test in the second category of cases.

*State* v. *Barnes*, 132 Conn. 370, 44 A.2d 708 (1945), is a paradigmatic example. In *Barnes*, four defendants were charged with conspiracy to steal fur coats from furriers located in Stamford and Norwalk. The evidence adduced at trial revealed that, on the night of October 11, 1944, the four defendants had entered two small fur stores and had stolen fur coats in a similar manner: one defendant distracted the proprietor of the store by

requesting his assistance while two defendants blocked the proprietor's view and the fourth defendant concealed a fur coat on her person. Id., 371. At the defendants' trial, the trial court admitted evidence of uncharged misconduct relating to the defendants' subsequent attempt to steal a fur coat. The evidence revealed that, two hours after they had visited the Stamford and Norwalk stores, the defendants had visited a New Haven furrier, where the proprietor observed one of the defendants attempting to conceal a fur coat beneath her skirt. Id. The proprietor contacted the police, and the defendants subsequently were arrested. A search revealed that each of the defendants had "three or four large pins generally known as horse blanket pins"; id., 372; that presumably had been used to pin the fur coats beneath the defendants' skirts.

On appeal, the defendants conceded that the evidence of uncharged misconduct was admissible to prove identity, but maintained that it was inadmissible for any other purpose. Id. We rejected this claim, noting that evidence of uncharged misconduct is admissible to establish "a common scheme embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other." (Internal quotation marks omitted.) Id. We concluded that, because the charged and uncharged crimes "might almost be described as identical . . . [e]very requirement of the exception to the rule [had been] fully met." Id., 373. We therefore concluded that the trial court properly had admitted the evidence of uncharged misconduct to establish a common scheme or plan. In *Barnes*, the marked similarity of the modus operandi of the charged and uncharged crimes, coupled with proximity of time and place of commission, supported the inference that the defendants had an overall scheme or plan to steal fur coats, and that both the charged

and uncharged crimes had been executed in furtherance of this plan.

Although this permissive inference may arise in some, if not many cases, we caution that it will not arise in *all* cases. As the Washington Court of Appeals aptly observed, "[s]omething more than the doing of similar acts is required in evidencing design, as the object is not merely to negative an innocent intent, but to prove the existence of *a definite project* directed toward completion of the crime in question." (Emphasis in original; internal quotation marks omitted.) *State* v. *Harris*, 36 Wash. App. 746, 751, 677 P.2d 202 (1984); see also *People* v. *Hansen*, 313 Ill. App. 3d 491, 505, 729 N.E.2d 934 (2000) ("In determining whether multiple crimes have been committed as part of a common design, scheme, or plan, we find it far more sensible to focus on the defendant's state of mind or purpose in committing the offenses than on the factual similarities of the offenses. Our conclusion in this regard is supported by the fact that similarities between crimes is the focus for determining the admissibility of other-crimes evidence to establish the existence of modus operandi. In fact, we suspect that confusion between the concepts of common design, scheme, or plan, and modus operandi . . . has led to the line of cases on which the [s]tate relies." [Citation omitted.]); see also 29 Am. Jur. 2d 514–15, Evidence § 448 (1994) ("Some courts consider the defendant's modus operandi as part of, or closely related to a scheme or plan. But more generally, the term modus operandi suggests that since the defendant acted in a similar and unusual or distinctive manner previously, it is more likely that he, rather than someone else, did the act on the occasion of the charged crime, so that the inference is from modus operandi to the identity of [the] defendant as the culprit." [Internal quotation marks omitted.]). Thus, when seeking to admit evidence pursuant to the common scheme or plan

exception, "it is not enough to show mere similarity between the [charged and uncharged] crimes"; 1 E. Imwinkelried, supra, § 3:23, p. 124; because "[s]tanding alone, a series of similar acts does not establish the existence of a true plan. A series of similar robberies could be the result of separate decisions to rob." Id., pp. 124–25. Accordingly, to establish the existence of a true plan in the defendant's mind based *solely* on the marked similarities shared by the charged and uncharged crimes, the state must produce sufficient evidence to: (1) establish the existence of a signature, modus operandi, or logo; *and* (2) support "a permissive inference that both crimes were related to an overall goal in the defendant's mind." Id., p. 125.

We need not provide a laundry list of factors that support such a permissive inference. A review of our jurisprudence reveals, however, that one of the most decisive factors is the proximity of time and place of commission of the charged and uncharged crimes. Accordingly, when both the charged and uncharged crimes exhibit the existence of a signature, and were committed within the same limited geographic area and time period, a permissive inference ordinarily arises that the charged and uncharged crimes were the individual manifestations of a true plan in the defendant's mind. See *State* v. *Greene*, supra, 209 Conn. 464–65 (crimes tried jointly committed in same vicinity of city, at similar time of day and within three days of each other); *State* v. *Jones*, supra, 205 Conn. 661 (charged and uncharged crimes committed "in the same general neighborhood" and six days apart); *State* v. *Mandrell*, supra, 199 Conn. 152 (charged and uncharged crimes committed on same street in Hartford and five years apart, but defendant was incarcerated during much of intervening period); *State* v. *Braman*, 191 Conn. 670, 680, 469 A.2d 760 (1983) (charged and uncharged crimes committed "in adjoining towns and . . . within three

weeks of each other"); *State* v. *Barnes*, supra, 132 Conn. 371–72 (charged and uncharged crimes occurred in nearby towns within hours of each other).

In sum, we conclude that evidence of uncharged misconduct is admissible in nonsex crime cases to establish the existence of a common scheme or plan only if it supports a "permissive inference that both crimes were related to an overall goal in the defendant's mind." 1 E. Imwinkelried, supra, § 3.23, p. 125. Two distinct avenues exist by which the proponent of the uncharged misconduct evidence may seek to establish the existence of this permissive inference. First, the nature of the charged and uncharged crimes, combined with connecting evidence, if any, may give rise to an inference that a common scheme or plan existed. See, e.g., *State* v. *Shindell*, supra, 195 Conn. 134–35. In this category of cases, the admissibility of the evidence does not depend on the degree of similarity shared by the charged and uncharged crimes, but, rather, on the extent to which it is probative of the existence of an overall plan in the defendant's mind. Id. Second, when the charged and uncharged crimes appear to be separate and discrete criminal acts, but the proponent of the evidence claims that a common scheme or plan may be inferred from the modus operandi of the crimes, the crimes must share sufficient marked similarities so as to rise to the level of a signature *and* must support a permissive inference that they were committed in furtherance of an overall scheme or plan. See *State* v. *Mandrell*, supra, 199 Conn. 152; *State* v. *Barnes*, supra, 132 Conn. 373. In nonsex crime cases, regardless of the avenue by which the evidence of uncharged misconduct is admitted, once admitted, it is relevant to establish the defendant's motive, intent and identity. See *State* v. *Shindell*, supra, 133–34. This is because the evidence necessarily gives rise to the inference that the defendant had an overall plan that encompassed the commission

of the charged and uncharged crimes and, therefore that the *defendant*, rather than *someone else*, committed the crime charged.[7]

With these principles in mind, we turn now to the merits of the defendant's claim. In the present case, the state did not adduce evidence revealing a direct connection between the Burger King and Empire Pizza robberies. Compare id., 135. Likewise, the nature of the crimes, namely, armed robbery and felony murder, do not give rise to an inference that the charged and uncharged crimes necessarily were executed in furtherance of an overall scheme or plan. Compare *State* v. *Johnson*, 190 Conn. 541, 549, 461 A.2d 981 (1983) (defendant charged with larceny by false promise, element of which is to "scheme to defraud" and, therefore, common scheme or plan evidence was admissible). Rather, it is the modus operandi of the Burger King and Empire Pizza robberies that, the state claims, indicates the existence of a plan in the defendant's mind. Accordingly, we must evaluate the similarities shared by the two crimes to determine whether they are sufficiently distinctive and unique as to rise to the level of a signature. If, and only if this standard is met, do we proceed to consider whether the similarities shared by the crimes also give rise to an inference that an overall common scheme or plan existed.

In evaluating the similarities shared by the Burger King and Empire Pizza robberies, we note that the inference that the defendant committed both crimes "does not arise . . . from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and [the] defendant's prior offenses,

---

[7] We acknowledge that we have a different rule for sex crime cases. See *State* v. *Sawyer*, supra, 279 Conn. 343–51.

but also by numerous other crimes committed by persons other than [the] defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together." (Internal quotation marks omitted.) *State* v. *Esposito*, 192 Conn. 166, 172, 471 A.2d 949 (1984).

Our review of the record in the present case reveals that the Burger King and Empire Pizza robberies were executed in a dissimilar manner: the Burger King robbery occurred at 6:30 p.m. during the dinner rush hour when the restaurant was full of customers, whereas the Empire Pizza robbery occurred nearly three months later, at 9:30 p.m., when the restaurant was devoid of customers; the Burger King robbery was committed by two gunmen, whereas the Empire Pizza robbery was committed by a lone gunman; no one was injured during the course of the Burger King robbery, indeed, the primary gunman repeatedly apologized and said to the employees, "I wish I didn't have to do this to you," whereas the gunman in the Empire Pizza robbery violently shot and killed one of the employees; and the gunmen in the Burger King robbery fled the scene by automobile, whereas the gunman in the Empire Pizza robbery fled the scene by foot. Cf. *State* v. *Jones*, supra, 205 Conn. 661–63 (trial court properly admitted evidence to establish common scheme or plan because all three incidences involved same perpetrators who exhibited excessive and unnecessary violence toward highly vulnerable victims); *State* v. *Banks*, 59 Conn. App. 112, 125, 755 A.2d 951 ("factual similarities of each robbery weigh in favor of admissibility to show a common scheme . . . [because] [b]oth were committed within two weeks of one another and in close physi-

cal proximity; both stores were Bedding Barns; both were robbed by a black male near closing time; the suspect described by the witnesses from each store was carrying a bag from which he pulled a silver handgun; the suspect in each case asked for the bank bag after asking for money from the cash register; the suspect in each case locked the victims in a room and fled"), cert. denied, 254 Conn. 950, 762 A.2d 904 (2000); *State* v. *McClendon*, 45 Conn. App. 658, 675, 697 A.2d 1143 (1997) (trial court properly admitted evidence under common scheme or plan exception because "[1] all four robbery locations are in close proximity; [2] all four crimes occurred within a six day period; [3] each robbery was a weekday, daylight robbery of a small business office at either the beginning or end of the day; [4] in each robbery, there was a lone perpetrator using a gun; [5] in each robbery, the gunman placed his weapon close to the victim and announced that it was a 'stickup'; [6] in each robbery, there was an insistent search for money and wallets; [7] in three of the four robberies, the defendant fled on foot; and [8] the same gun was used in [three of the robberies]"), aff'd, 248 Conn. 572, 730 A.2d 1107 (1999).

We recognize that the perpetrators of both robberies wore dark clothing and masks to shield their identities, and displayed firearms to obtain money from the cash registers forcibly, but we conclude that these similarities "are of such common occurrence that they are shared not only [by the two cases], but also by numerous other crimes committed by persons other than [the] defendant." (Internal quotation marks omitted.) *State* v. *Esposito*, supra, 192 Conn. 172; accord *State* v. *Sierra*, supra, 213 Conn. 431–32 ("There is nothing distinctive about the use of a knife to commit an armed robbery . . . . There is also nothing particularly distinctive about the use of threats during the commission of an armed robbery. . . . Nor is there any marked signifi-

cance in the items taken from the two victims: money, jewelry, clothing, and automobiles." [Citations omitted.]). Because the Burger King and Empire Pizza robberies do not share any distinctive marks of similarity from which it logically may be inferred that the same person committed both crimes, the trial court improperly concluded that the evidence in each case was admissible in the other case to establish the existence of a common scheme or plan.

The state nonetheless claims that the trial court properly admitted the evidence of uncharged misconduct because the defendant's *postcriminal conduct* in each case was unique and distinctive in that the defendant engaged in a pattern of self-defeating behavior whereby he implicated himself in each crime. In support of this claim, the state relies on the following additional facts that the jury reasonably could have found: (1) the defendant admitted to Evelyn Reyes, the owner of the Short Stop Grocery, which is located adjacent to Empire Pizza, that he had committed the Burger King robbery; (2) sometime after the Burger King robbery, the defendant tried to sell Reyes a black handgun; (3) sometime after the Empire Pizza robbery, the defendant purchased merchandise at the Short Stop Grocery with a $50 bill, which was highly unusual; (4) the defendant informed Michael Bogan, his cell mate in April, 2002, that, although he was not involved in the Empire Pizza robbery, the victim "shouldn't [have] tried to stop it and that it wasn't his money anyway, and that . . . the killing was probably an accident, was most likely an accident"; (5) the defendant informed Brian Foley, a detective with the Hartford police department, that he might or might not know information relevant to the Empire Pizza robbery; (6) when Foley, in an attempt to play a "cat and mouse" game with the defendant informed him that the perpetrator of the Empire Pizza robbery had not worn a mask, the defendant responded:

"Are you crazy? Do you think I would actually rob a place without wearing a mask?" The state claims that "[a]ll of the differences in the commission of the two robberies . . . lack legal significance in connection to the singular aspects of his modus operandi that involved continuously acting in a way that was self-defeating and ensured his apprehension as the perpetrator of the two robberies." We are not persuaded.

We acknowledge that there may be unique circumstances in which a defendant's *post*criminal conduct gives rise to an inference that both the charged and uncharged crimes had been executed in furtherance of a common scheme or plan, but the facts of this case do not support such an inference. Although the evidence on which the state relies indicates that the defendant carelessly and recklessly implicated himself in the commission of the Burger King and Empire Pizza robberies, it does not indicate that the defendant had an overall scheme or plan that encompassed the commission of both the Burger King and Empire Pizza robberies. Simply stated, under the circumstances of the present case, the defendant's inculpatory postcriminal conduct simply is too slim an evidentiary reed upon which to admit evidence of uncharged misconduct under the common scheme or plan exception.

## B

### Harmless Error

The defendant claims that, in light of the trial court's improper admission of evidence of uncharged misconduct in both the Burger King and Empire Pizza cases, the trial court improperly consolidated the two cases for trial under *State* v. *Boscarino*, supra, 204 Conn. 722–24. The state responds that the trial court's evidentiary impropriety, if any, was harmless, and that its consolidation of the two cases was proper under the *Boscarino* standard. Because the defendant has pro-

vided us with a fair assurance that the trial court's evidentiary impropriety substantially affected the verdicts in both the Burger King and Empire Pizza cases, we conclude that the defendant is entitled to a new trial.

As previously explained, consolidation of factually similar but legally unrelated cases is appropriate and proper under circumstances in which the jury is capable of assessing the merits of each case fairly and independently in accordance with the trial court's cautionary instructions. To determine whether the jury possesses such capability, the court must consider the following factors: (1) whether the crimes charged involve discrete and easily distinguishable factual scenarios; (2) whether the crimes charged involve brutal or shocking conduct on the defendant's part; (3) whether the trial was unduly lengthy or complex; and (4) if any of the first three factors are present, whether the trial court's jury instructions cured any prejudice that might have occurred. See, e.g., *State* v. *Ancona*, 256 Conn. 214, 218–20, 772 A.2d 571 (2001) (per curiam) (trial court properly consolidated cases for trial because crimes charged were discrete and easily distinguishable, did not involve brutal or shocking conduct, trial was not unduly lengthy or complex and jury properly was instructed to consider each case separately); *State* v. *Delgado*, 243 Conn. 523, 533–37, 707 A.2d 1 (1998) (same); see also *State* v. *Boscarino*, supra, 204 Conn. 722–24.

We need not decide in the present appeal whether the trial court abused its discretion in consolidating the Burger King and Empire Pizza cases for trial under the *Boscarino* standard. This is because the *Boscarino* standard seeks to discern whether a jury that has been *properly instructed* to consider the evidence adduced in each case separately and independently has the capability to follow these instructions in light of the factual and legal complexity of the trial and the possibly preju-

dicial nature of the evidence presented. Thus, under the circumstances of the present case, in which the jury was *improperly instructed* that it *could consider* the evidence adduced in the Burger King and Empire Pizza cases *collectively* if it found the evidence to establish "a characteristic method in the commission of criminal acts," application of that standard would require us to assume a set of facts that does not exist. Accordingly, the fundamental predicate for application of the *Boscarino* standard is absent from the present case, and we express no opinion with respect to whether consolidation would be appropriate with proper jury instructions under that standard.

To determine whether the defendant was prejudiced by the improper admission of common scheme or plan evidence in both the Burger King and Empire Pizza cases, we turn to well established evidentiary principles. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*, supra, 279 Conn. 352. As we recently have noted, "a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 357; see also id., 392–93 (*Borden, J.*, concurring) ("The 'more probable than not' standard suggests that if our appellate minds are in equipoise on the question of the harm caused by a trial error, the error is deemed to be harmless and the defendant has not carried his burden of establishing harm. . . . I am persuaded that, if the defendant successfully brings our minds to that point of equipoise, then we do not have a fair assurance that the error did not substantially affect the verdict, and the defendant should be granted a new trial. In other words, whether the error was serious enough to require a new trial should not, in my view, rest on such a

finely honed knife's edge."). "[W]hether [the improper admission of evidence] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative . . . the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . Because the present case involves the improper admission of uncharged misconduct evidence, the most relevant factors to be considered are the strength of the state's case and the impact of the improperly admitted evidence on the trier of fact." (Citations omitted; internal quotation marks omitted.) Id., 358.

We turn first to the strength of the state's cases. At the outset, we note that the primary issue in dispute at the defendant's trial was identity, namely, whether the defendant was the person who had committed the Burger King and Empire Pizza robberies. In the Burger King case, the state adduced the following relevant evidence with respect to the issue of identity: (1) the testimony of Eliseo Bennett, the defendant's coconspirator and accomplice in the Burger King robbery, identifying the defendant as the primary gunman; (2) the testimony of Julissa Chaparro, the assistant manager of Burger King, identifying the defendant as the primary gunman; and (3) the defendant's admission to Evelyn Reyes that he had committed the Burger King robbery. In light of the foregoing evidence, we conclude that, overall, the state's evidence in the Burger King case was strong.

With respect to the Empire Pizza case, the state's identity evidence primarily consisted of: (1) the testimony of Reyes, the owner of the Short Stop Grocery, which is located adjacent to Empire Pizza, that the

defendant had been in her store shortly before the robbery; and (2) eyewitness identifications made for the first time at trial by Antonaras and Carrasquillo, both of whom were subjected to extensive cross-examination with respect to their opportunity to view the perpetrator of the robbery and the belated timing of their identifications. The defendant presented evidence in support of a third party culpability defense. Kenneth Robinson, a longtime friend of the defendant, testified that he was at Empire Pizza and the Short Stop Grocery shortly before the robbery and that, although he had not seen the defendant, he saw a person matching the description of the gunman: an African-American or Hispanic individual dressed in a black, hooded sweatshirt who was approximately five feet, six inches or five feet, five inches tall. In light of the lack of physical evidence connecting the defendant to the robbery, and the conflicting evidence with respect to the defendant's presence at the scene of the crime, we conclude that the state's evidence in the Empire Pizza case was not particularly strong.

We next turn to the impact of the improperly admitted evidence on the trier of fact. That is, we must next determine the extent to which the jury's consideration of the evidence in the Empire Pizza case impacted its verdict in the Burger King case and, conversely, the extent to which the jury's consideration of the evidence in the Burger King case impacted its verdict in the Empire Pizza case. In doing so, we keep in mind that, "[j]oinder gave the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that would have been unavailable if the cases had been tried separately." *State* v. *Boscarino*, supra, 204 Conn. 723.

We begin with the Burger King case. Although the state's evidence in the Burger King case was strong, we cannot conclude that the trial court's improper

admission of the evidence relating to the Empire Pizza case was harmless. It is well established that, "[a]ny improper evidence that may have a tendency to excite the passions, awaken the sympathy, or influence the judgment, of the jury, cannot be considered as harmless." (Internal quotation marks omitted.) *State v. Payne*, supra, 219 Conn. 106. The evidence relating to the Empire Pizza case not only involved the commission of an armed robbery, but it also involved the commission of a felony murder during the course of that robbery. This evidence, which the jury explicitly was permitted to consider while deliberating on the defendant's guilt in the Burger King case, impermissibly suggested to the jury that the defendant had a bad character or a propensity to engage in criminal behavior and, further, that the defendant was a violent and dangerous individual. See *State v. Sawyer*, supra, 279 Conn. 360–61 ("uncharged misconduct evidence that portrayed the defendant as intimidating, hot-tempered, inclined to threaten other people and capable of using a knife to back up his threats was unduly prejudicial because it impermissibly suggested that the defendant had a bad character and a propensity for criminal behavior"); *State v. Payne*, supra, 106 (trial court's improper admission of evidence of attempt to commit second robbery was likely to excite passions of jurors and, therefore, was harmful); *State v. Onofrio*, 179 Conn. 23, 32–33, 425 A.2d 560 (1979) (trial court's improper admission of evidence of defendant's gun collection was likely to excite passions of jurors and, therefore, was harmful). Because the trial court's improper admission of this evidence was likely to have excited the passions of the jurors, we conclude that it was not harmless.

With respect to the Empire Pizza case, as previously noted, the state's evidence linking the defendant to the crimes charged was not particularly strong. The trial court's improper admission of evidence revealing the

defendant's culpability in the Burger King robbery therefore impermissibly suggested to the jury that the defendant was "predisposed to commit the crimes charged" and, as such, provided the jury with a prejudicial basis on which to base its verdict. *State* v. *Payne,* supra, 219 Conn. 106; see also *State* v. *Ellis,* supra, 270 Conn. 367–68 (trial court's improper consolidation of multiple cases for trial and improper admission of evidence of uncharged misconduct in each case was not harmless); *State* v. *Sierra,* supra, 213 Conn. 437 (improper admission of evidence of uncharged misconduct likely "influenced the jury to believe that the defendants were violent persons predisposed to commit, in conjunction with one another, the alleged offenses for which they were on trial"). Accordingly, the defendant has provided us with a fair assurance that the admission of this evidence substantially affected the jury's verdict.

The trial court's improper instructions to the jury concerning the cross admissibility of the evidence adduced in the Empire Pizza and Burger King cases further undermines our confidence in the verdicts. The trial court instructed the jurors that, although they "must separately consider each charge, you may, as you deliberate on the two separate charges, consider evidence of the one charge in the case of the other for the sole purpose, if you find that it is credible to do so, as to whether or not it establishes a *characteristic method in the commission of criminal acts.*" (Emphasis added.) Not only did this instruction fail to inform the jury of the very purpose for which the evidence of uncharged misconduct had been admitted, namely, to establish the existence of a common scheme or plan in the defendant's mind, but it also misstated the evidentiary standard by which the existence of this plan must be proven. See part I A of this opinion.

For the foregoing reasons, we conclude that the judgments of conviction in the Burger King and Empire

Pizza cases must be reversed. Upon remand, if the state again moves to consolidate the Burger King and Empire Pizza cases for trial, it is left to the considered judgment of the trial court to determine whether consolidation would be appropriate under *State* v. *Boscarino*, supra, 204 Conn. 722–24, in accordance with the principles articulated in the body of this opinion, including, of course, the precepts that the evidence in each case is not cross admissible to establish a common scheme or plan, and that an order of consolidation must be accompanied by adequate and proper jury instructions cautioning the jury to consider the evidence in each case separately and independently. See *State* v. *McKenzie-Adams*, supra, 281 Conn. 521 (within discretion of trial court to consolidate or sever multiple cases for trial); *State* v. *Boscarino*, supra, 723 (criminal defendant has "right to the jury's fair and independent consideration of the evidence in each case").

II

WHETHER THE TRIAL COURT IMPROPERLY
DENIED THE DEFENDANT'S REQUEST
TO WAIVE HIS PRESENCE AT THE
PROBABLE CAUSE HEARING

The defendant next claims that the trial court improperly denied his request to waive his presence at his probable cause hearing because the state had failed to proffer a legitimate reason to compel his presence. The state responds that it had proffered a legitimate reason to compel the defendant's presence, namely, to identify the defendant as the perpetrator of the crimes charged. Alternatively, if we conclude that the trial court abused its discretion, the state claims that any impropriety was harmless. We conclude that the trial court did not abuse its discretion by denying the defendant's request to exclude himself from the probable cause hearing.

The following additional facts are necessary for our resolution of this claim. At the commencement of the probable cause hearing, the defendant moved to waive his presence in court during the testimony of any potential eyewitnesses. The defendant claimed that it would be prejudicial "to allow an additional viewing when sometime down the road there's going to be most likely a trial in this matter where the issue of identification is going to be fairly highly contested." The state objected to the defendant's request, noting that, although the defendant "enjoys [a right] to be present for the proceedings, there's no corresponding right for him to be absent." The state further claimed that the potential eyewitnesses previously had identified the defendant via a photographic array, and that alternate witnesses were not available to provide the crucial link "between the person [depicted in] the photograph . . . and the defendant . . . ." In response, the defendant offered "to stipulate that the person [depicted] in the photograph is [the defendant] and that [he] was the person [previously] identified by the eyewitnesses." Thereafter, the trial court canvassed the defendant, and determined that his waiver was knowing, intelligent and voluntary.

At this point, the state claimed that the trial court should deny the defendant's request because the defendant's absence from the hearing would thwart "any possible in-court identification" and would "thereby, postpone, perhaps by years, any opportunity for an in-court identification to occur. And, from the passage of time, alone, the state might be put at a disadvantage because of the [witnesses'] memories or perhaps change in appearance of the defendant from this time to that." The defendant responded that an in-court identification was not germane to the probable cause proceedings and that the identity of the defendant adequately could be established through the proffered

stipulation. The state claimed, however, that the issue of identity "is germane now because the state has to prove, at this hearing, that there is probable cause that this defendant, that's sitting here today, committed these crimes to permit the prosecution to continue. And the fact that counsel is willing to stipulate to something does not remove that burden from the state." The trial court observed that "the state has the burden of proving identification in all cases. Even in cases in which the identification is not, actually, disputed . . . ." The trial court, relying on *State* v. *Reddick*, 224 Conn. 445, 464, 619 A.2d 453 (1993), further noted that the defendant does not have a right "to absent himself for tactical purposes." Accordingly, the trial court denied the defendant's request.

It is well established that a criminal defendant has a constitutional right to be present at all critical stages of his prosecution; see *State* v. *Lopez*, 271 Conn. 724, 732, 859 A.2d 898 (2004); including a probable cause hearing conducted pursuant to article first, § 8 (a), of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments, and General Statutes § 54-46a.[8] See *Coleman* v. *Alabama*,

---

[8] Article first, § 8 (a), of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments, provides in relevant part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger."

General Statutes § 54-46a provides: "(a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in Superior Court. The court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving

399 U.S. 1, 9, 90 S. Ct. 1999, 26 L. Ed. 2d 387 (1970) (concluding that preliminary hearing conducted pursuant to Alabama statute was "a 'critical stage' of the [s]tate's criminal process"); *State* v. *Mitchell*, 200 Conn. 323, 332, 512 A.2d 140 (1986) (probable cause hearing "is a critical stage in the prosecution"); see also Practice Book § 44-7 ("[t]he defendant has the right to be present at the arraignment, at the time of the plea, at evidentiary hearings, at the trial, and at the sentencing hearing, except as provided in [s]ections 44-7 through 44-10"). A criminal defendant does not, however, have a concomitant right to be absent from such proceedings. See *State* v. *Reddick*, supra, 224 Conn. 464–66 (defendant did not have constitutional right to be absent from hearing on motion to suppress eyewitness identifications). "Indeed, federal courts have held that a trial court, pursuant to rule 43 of the Federal Rules of Criminal Procedure,[9] has the right and the obligation to compel

---

chain of custody shall be exempt from such rules. No motion to suppress or for discovery shall be allowed in connection with such hearing. The accused person shall have the right to counsel and may attend and, either individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.

"(c) If, from the evidence presented pursuant to subsection (b) of this section, it appears to the court that there is probable cause to believe that the accused person has committed the offense charged, the court shall so find and approve the continuance of the accused person's prosecution for that offense. A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense."

[9] Rule 43 (a) of the Federal Rules of Criminal Procedure provides in relevant part: "[T]he defendant must be present at . . . the initial appearance, the initial arraignment, and the plea . . . every trial stage, including jury impanelment and the return of the verdict; and . . . sentencing. . . ."

the defendant's presence at all stages of a trial. *United States* v. *Cannatella*, 597 F.2d 27 (2d Cir. 1979); *United States* v. *Moore*, 466 F.2d 547, 548 (3d Cir. 1972), cert. denied, 409 U.S. 1111, 93 S. Ct. 920, 34 L. Ed. 2d 692 (1973) (rule 43 does not vest a right of absence in a defendant; fifth amendment right against self-incrimination is not violated by compelling the defendant's presence)." *State* v. *Reddick*, supra, 464.

We therefore review the trial court's denial of the defendant's request to exclude himself from the probable cause hearing for abuse of discretion. See id., 467 (reviewing trial court's denial of defendant's request to exclude himself from suppression hearing under abuse of discretion standard); see also Practice Book § 44-10.[10] "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Reddick*, supra, 224 Conn. 467. Additionally, "[t]he propriety of the court's action on the defendant's motion to exclude must be gauged at the time it made its ruling." Id., 469.

"The probable cause hearing is designed to safeguard an accused's rights by requiring the state to demonstrate, at an early stage of the prosecution, that the evidence of the defendant's guilt is sufficient to warrant a prosecution in connection with the particular charge." *State* v. *Reynolds*, 264 Conn. 1, 27, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). The burden is on the state to produce

[10] Practice Book § 44-10 provides in relevant part: "Unless otherwise ordered by the judicial authority, a defendant need not be present in the following situations . . .

"(5) In proceedings in which the defendant otherwise waives his or her right to be present."

sufficient evidence to "warrant a person of reasonable caution to believe that the [defendant has] committed the crime[s] with which he [is] charged." (Internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 598, 682 A.2d 972 (1996). In light of this burden, we previously have concluded that the state is "entitled to elicit [eyewitness] testimony on the issue of identification through the usual mode of putting [the eyewitness] on the witness stand and asking him to identify his assailant if his assailant was present in the courtroom." *State* v. *Tatum*, 219 Conn. 721, 729, 595 A.2d 322 (1991); cf. General Statutes § 54-46a (b) ("[n]o motion to suppress or for discovery shall be allowed in connection with such hearing"). Accordingly, the state proffered a legitimate reason to compel the defendant's presence at the hearing, namely, to establish the identity of the defendant as the perpetrator of the crimes charged through an in-court identification procedure.

The defendant claims, however, that the state adequately could have established the element of identity through the proffered stipulation coupled with the testimony of eyewitnesses who previously had identified the defendant via a photographic array and, therefore, an in-court identification was unnecessary and no legitimate reason existed to compel the defendant's presence at the hearing. We disagree. Although a prior out-of-court identification, standing alone, likely would have been sufficient to establish probable cause to believe that the defendant was the perpetrator of the crimes charged, the state legitimately sought to introduce additional evidence of identity to bolster the strength of its case. Accordingly, a legitimate governmental reason existed to compel the defendant's presence, and the trial court therefore did not abuse its discretion by denying the defendant's request.

The defendant claims, however, that the trial court improperly denied his request because an in-court eye-

witness identification inherently is suggestive. See *State v. Tatum*, supra, 219 Conn. 727–32 (concluding that in-court identification procedure inherently is suggestive, but not unnecessarily or impermissibly so). Our thorough review of the record reveals, however, that the defendant did not raise this claim before the trial court, nor did he request less suggestive in-court identification procedures.[11] Accordingly, we conclude that this claim is not preserved for our review. See *West Farms Mall, LLC* v. *West Hartford*, 279 Conn. 1, 28, 901 A.2d 649 (2006) ("[t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge" [internal quotation marks omitted]); *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 82, 848 A.2d 395 (2004) ("We have stated repeatedly that we ordinarily will not review an issue that has not been properly raised before the trial court. . . . Only in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court." [Citations omitted; internal quotation marks omitted.]); Practice Book § 60-5 ("court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial").

### III

### WHETHER THE TRIAL COURT IMPROPERLY ADMITTED EVIDENCE AT THE DEFENDANT'S PROBABLE CAUSE HEARING IN VIOLATION OF THE CONFRONTATION CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS

The defendant next claims that the trial court improperly admitted a postmortem report of the associate state

---

[11] As we observed in *State* v. *Tatum*, supra, 219 Conn. 729, neither the state nor the trial court have an inherent responsibility to take "extraordinary

medical examiner at his probable cause hearing in violation of the defendant's right to confrontation under the federal and state constitutions.[12] See General Statutes § 54-46a (b) ("[t]he court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence"). Specifically, the defendant claims that the report contained testimonial hearsay statements and, therefore, was inadmissible under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).[13] The state responds

steps to lessen the suggestiveness of the [in-court] confrontation by using some other identification procedure . . . ." See id. (noting that defendant could have requested to be seated among courtroom spectators to render in-court identification less suggestive).

[12] "The sixth amendment to the United States constitution provides in relevant part: In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . . The sixth amendment right of confrontation is made applicable to the states through the due process clause of the fourteenth amendment. See *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)." (Internal quotation marks omitted.) *State* v. *Greene*, 274 Conn. 134, 165 n.22, 874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006).

We note that the defendant has failed to provide an independent analysis of his state constitutional claim under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 74 n.12, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

[13] "In *Crawford*, the United States Supreme Court announced a heightened threshold for the admission of hearsay statements deemed to be testimonial. . . . The court held that [w]here *testimonial* evidence is at issue . . . the [s]ixth [a]mendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 595, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). "Although the court declined to define the [term] testimonial . . . it considered three formulations of th[e] core class of testimonial statements . . . . The first formulation consists of ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reason-

that *Crawford* is inapplicable to pretrial hearings, but, even if the postmortem report improperly was admitted, the impropriety was harmless beyond a reasonable doubt because ample evidence existed to support the trial court's probable cause determination. Because we conclude that the admission of the report was harmless beyond a reasonable doubt, we need not determine whether *Crawford* applies to a probable cause hearing, or whether the postmortem report is testimonial in nature.

At the defendant's probable cause hearing, the following relevant evidence was admitted into evidence with respect to the charge of felony murder. Antonios Antonaras testified that, during the course of the Empire Pizza robbery, the victim attempted to subdue the gunman physically. A struggle ensued, during which the gunman shot the victim twice. The gunman immediately fled the restaurant, and the victim collapsed to the floor. Dana Peterson, a police officer with the Hartford police department, testified that she arrived at Empire Pizza soon after the shooting had occurred, and that she found the victim "lying on the floor nonresponsive." She immediately checked his vital signs, and discovered that he was not breathing and did not have a pulse. She began cardiopulmonary resuscitation, and did not stop until the ambulance crew arrived to transport the victim to the hospital. Thereafter, Gregory Gorr, a crime scene technician in the evidentiary services division of the

ably expect to be used prosecutorially . . . . The second formulation consists of extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . . Finally, the third formulation consists of statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . The court did not adopt any one particular formulation, noting that, [t]hese formulations all share a common nucleus and then define the [c]lause's coverage at various levels of abstraction around it." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 380, 908 A.2d 506 (2006).

Hartford police department, testified that he had observed an autopsy conducted on the victim's body by an associate medical examiner, during which the examiner removed a spent bullet from the victim's body. The trial court also admitted the postmortem report, which lists the cause of the victim's death as a "gunshot wound of chest and abdomen," and the manner of his death as a "homicide," over the defendant's objection.[14] At the conclusion of the hearing, the trial court found that "there is no question at all" that the state had adduced sufficient evidence to establish that the victim had been murdered during the course of a felony in violation of § 53a-54c.

"At the outset, we note that our standard of review for the trial court's evidentiary rulings depends on whether the claimed error is of constitutional magnitude. . . . The court's ruling that the admission of the report entry did not violate the constitutional mandates of *Crawford* . . . raises a question of law over which we exercise plenary review. [I]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 592, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007); cf. *State* v. *Brown*, 279 Conn. 493, 508, 903 A.2d 169 (2006) (deprivation of counsel in violation of sixth amendment at probable cause hearing subject to harmless error analysis because "this court has required the automatic reversal of a conviction due to error at the probable cause hearing *only when the error was a lack of sufficient evidence to justify the finding of probable cause*" [emphasis added]).

---

[14] The defendant objected to the admission of the postmortem report on the ground that it violated his "confrontation rights."

It is well established that, "[t]he quantum of evidence necessary to establish probable cause at a preliminary hearing is less than the quantum necessary to establish proof beyond a reasonable doubt at trial . . . . In making its finding, the court had to determine whether the government's evidence would warrant a person of reasonable caution to believe that the accused [had] committed the crime. . . . The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear that [t]here is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson*, 213 Conn. 708, 720–21, 570 A.2d 174 (1990); see also *State* v. *Munoz*, 233 Conn. 106, 135, 659 A.2d 683 (1995) ("proof of probable cause requires less than proof by a preponderance of the evidence").

Assuming without deciding that the trial court improperly admitted the postmortem report in violation of the defendant's sixth amendment right to confrontation,[15] we conclude that this evidentiary impropriety

---

[15] We note that "[t]here is no federal constitutional requirement applicable to the states mandating . . . a probable cause hearing in order to place a person on trial in a state criminal proceeding." *State* v. *Kane*, 218 Conn. 151, 158, 588 A.2d 179 (1991). Indeed, in the federal system, most felonies and capital offenses are prosecuted by indictment, to which the sixth amendment right to confrontation does not apply. See U.S. Const., amend. V ("[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a [g]rand [j]ury"); *Costello* v. *United States*, 350 U.S. 359, 361–64, 76 S. Ct. 406, 100 L. Ed. 397 (1956) (hearsay evidence admissible in indictment proceedings); see also *Gerstein* v. *Pugh*, 420 U.S. 103, 119, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975) (fourth amendment requires preliminary hearing to justify restraint of liberty pending trial, but "the full panoply of adversary safeguards—counsel, confrontation, cross-examination and compulsory process for witnesses" is not required); *Gerstein* v. *Pugh*, supra, 122–23 (court distinguished *Coleman* v. *Alabama*, supra, 399 U.S. 1, wherein it had held that preliminary hearing was critical stage of Alabama prosecution at which criminal defendant has

was harmless beyond a reasonable doubt because

sixth amendment right to counsel because: [1] "under Alabama law the function of the preliminary hearing was to determine whether the evidence justified charging the suspect with an offense," and [2] "Alabama allowed the suspect to confront and cross-examine prosecution witnesses at the preliminary hearing").

The states that grant a criminal defendant an adversarial probable cause hearing under state law have arrived at conflicting conclusions with respect to the applicability of the sixth amendment right to confrontation. Some states have concluded that an adversarial probable cause hearing is a critical stage in the prosecution of the accused at which the full panoply of sixth amendment rights must apply. See *Mascarenas* v. *State*, 80 N.M. 537, 539–41, 458 P.2d 789 (1969); *Commonwealth ex rel. Buchanan* v. *Verbonitz*, 525 Pa. 413, 417–19, 581 A.2d 172 (1990), cert. denied, 499 U.S. 907, 111 S. Ct. 1108, 113 L. Ed. 2d 217 (1991); cf. *Myers* v. *Commonwealth*, 363 Mass. 843, 851–56, 298 N.E.2d 819 (1973) (Massachusetts statute confers right to confrontation at preliminary hearing); *State* v. *Anderson*, 612 P.2d 778, 786 (Utah 1980) (admission of hearsay evidence at preliminary hearing violated defendant's right to confrontation under Utah constitution), superseded by constitutional amendment as stated in *State* v. *Rhinehart*, 153 P.3d 830, 835 and n.4 (Utah App. 2006). The majority of states, however, have concluded that the sixth amendment right to confrontation "is basically a trial right"; *Barber* v. *Page*, 390 U.S. 719, 725, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968); that does not apply to preliminary hearings. See *Whitman* v. *Superior Court*, 54 Cal. 3d 1063, 1082, 820 P.2d 262, 2 Cal. Rptr. 2d 160 (1991) (concluding that "the new, limited form of preliminary hearing in [California] sufficiently resembles the [f]ourth [a]mendment probable cause hearing examined in *Gerstein* [v. *Pugh*], supra, 420 U.S. [118–23], to meet federal confrontation clause standards despite reliance on hearsay evidence"); *State* v. *Sherry*, 233 Kan. 920, 929, 667 P.2d 367 (1983) ("There is no constitutional right to allow the accused to confront witnesses against him at the preliminary hearing. . . . The [s]ixth [a]mendment right of confrontation is a protection that exists at the trial of the defendant."); *Clark County* v. *Witzenburg*, 145 P.3d 1002, 1005 (Nev. 2006) (en banc) (sixth amendment right to confrontation and, therefore, *Crawford* v. *Washington*, supra, 541 U.S. 36, does not apply to preliminary hearings); *State* v. *Woinarowicz*, 720 N.W.2d 635, 640–41 (N.D. 2006) (same); *Wilson* v. *State*, 655 P.2d 1246, 1250 (Wyo. 1982) ("[t]he use of hearsay testimony to establish probable cause at a preliminary hearing is practically a universally approved practice" that does not violate sixth amendment right to confrontation); see also 4 W. LaFave, J. Israel & N. King, Criminal Procedure (2d Ed. 1999) § 14.4 (c), p. 172 ("All jurisdictions grant the defense a right to cross-examine those witnesses presented by the prosecution at a preliminary hearing. This right is based on local law; the [United States] Supreme Court has long held that cross-examination at a preliminary hearing is not required by the confrontation clause of the [s]ixth [a]mendment."); note, "Confrontation Rights and Preliminary Hear-

ample evidence existed to support the trial court's probable cause determination. The evidence presented at the probable cause hearing established that, after the gunman had shot the victim, the victim collapsed to the floor, was unresponsive and had no vital signs. The victim was unable to be resuscitated, and the medical examiner found a bullet in the victim's body while performing an autopsy. This evidence was more than sufficient to warrant a person of reasonable caution to believe that the cause of the victim's death was the gunshot wounds inflicted during the course of the robbery. Accordingly, the alleged evidentiary impropriety was harmless beyond a reasonable doubt, and a new probable cause hearing is not required.

## IV

## WHETHER THE TRIAL COURT IMPROPERLY DENIED THE DEFENDANT'S MOTION TO SUPPRESS CERTAIN EYEWITNESS IDENTIFICATIONS

Lastly, the defendant claims that the trial court improperly denied his motion to suppress the pretrial and trial eyewitness identifications made by Antonaras. The defendant claims that the pretrial photographic array presented to Antonaras was unnecessarily suggestive because seven of the eight individuals depicted were customers of Empire Pizza. Additionally, the defendant claims that the identification was conducted in an unnecessarily suggestive manner because "a kind of competition" was introduced between Antonaras and her husband with respect to their ability to identify a suspect, and Antonaras was encouraged to use "her fingers to block out the parts of the face other than the

ings," 1986 Utah L. Rev. 75, 83–84 (1986) (prevailing weight of authority is against concluding that criminal defendant has constitutional right to confrontation at preliminary hearing). In light of our conclusion in the body of this opinion, we need not resolve this conflict in the present case.

eyes . . . ." The defendant further claims that Antonaras' identification of the defendant was unreliable because she had observed the masked perpetrator only briefly during the course of the robbery, and her initial description of the perpetrator does not match the physical appearance of the defendant. The state responds that neither the pretrial photographic array nor the manner in which it was conducted was unnecessarily suggestive, but, even if it was, Antonaras' identification of the defendant nonetheless was reliable because she had a clear view of the perpetrator and she expressed absolute certainty with respect to the accuracy of her identification. We conclude that the pretrial identification procedure was not unnecessarily suggestive and, therefore, affirm the trial court's denial of the defendant's suppression motion.

The following additional facts are necessary for our resolution of this claim. Prior to trial, the defendant moved to suppress "any pretrial or in-court identification of the defendant which the state intends to use at [the] defendant's trial" because "[t]he identification procedure employed was unnecessarily suggestive" and "[a]n in-court identification would be irretrievably tainted by the prior illegal identification and would thus lack an independent basis." The trial court held a hearing on the defendant's motion. At the hearing, both Antonaras and Brian Foley, a detective with the major crimes division of the Hartford police department who had presented the photographic array to Antonaras, testified with respect to the manner in which the identification procedure had been conducted. Three days after the Empire Pizza robbery, both Antonaras and her husband, Antonios Antonaras, arrived at the police station to attempt to identify the perpetrator of the robbery from a photographic array. The array contained eight photographs, each depicting an individual with similar physical characteristics. After directing Anto-

naras and her husband to separate rooms, Foley presented Antonaras with the array and "told her to carefully look at each [photograph] individually and that it's just as important to identify the innocent as it is to identify the guilty." Additionally, Antonaras read, signed and dated the following cautionary instructions, which were displayed prominently on the back of the array: "You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not obligated to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses nor indicate in any way that you have identified someone."

Upon viewing the array, Antonaras became very nervous, and indicated to Foley that she recognized seven of the eight individuals depicted as persons who previously had patronized Empire Pizza.[16] Although she

---

[16] The record reveals the following colloquy between Antonaras and the defendant's counsel during the probable cause hearing:

"[Defense Counsel]: Now, the question is, as you looked at number two and number seven, did it strike you then, did you say to yourself then, one of these guys has been in before?

"[Antonaras]: Yes.

"[Defense Counsel]: And it was number two and not number seven?

"[Antonaras]: There was seven out of the eight people on the sheet had been in our pizza place.

"[Defense Counsel]: So, only one of these people have—

"[Antonaras]: I've been there for many, many years, sir.

"[Defense Counsel]: Only one of these people hasn't been in?

"[Antonaras]: Yes.

"[Defense Counsel]: And you recognize the seven people that had been in there?

"[Antonaras]: The one on the bottom, I've never seen in there. The rest I have.

"[Defense Counsel]: When you say the one on the bottom, which one?

"[Antonaras]: To the right side, right there, number eight.

"[Defense Counsel]: You're indicating number eight?

was unable to identify initially the perpetrator of the robbery, she focused her attention on two individuals, both of whom previously had patronized Empire Pizza, because they shared a distinctive physical characteristic with the perpetrator, namely, widely spaced eyes. Foley then removed the photographic array from the room, and brought it to Antonios Antonaras to determine whether he could make a positive identification.[17] Foley subsequently returned with the array, at which point he and Antonaras began to discuss the fact that, because the perpetrator had worn a ski mask, the only facial feature she had seen was his eyes. Foley therefore suggested to Antonaras that she should "use her hands, her fingers, to cover portions of the face that the mask might cover." Thereafter, Antonaras isolated the eyes of the two individuals, and positively identified a photograph of the defendant, stating "[t]hat's him, I'll never forget those eyes." Foley asked Antonaras if she was 100 percent positive about the accuracy of her identification, and Antonaras responded affirmatively. At the suppression hearing, Antonaras testified that she had identified the defendant because "the eyebrows were arched, the eyes are bulging and they were far apart, exactly the way I remember it," and that she was "[q]uite certain" about the accuracy of her identification.

Antonaras also testified with respect to her opportunity to view the perpetrator during the robbery, explaining that she had seen him from a distance of approximately ten or twelve feet, and that she had made

---

"[Antonaras]: Number eight.

"[Defense Counsel]: So, of the eight, only number eight had never been in there before?

"[Antonaras]: Exactly.

"[Defense Counsel]: And you realized that right away?

"[Antonaras]: Naturally."

[17] Antonios Antonaras was unable to make a positive identification of the perpetrator, but he recognized the individuals depicted in the array as customers of Empire Pizza.

eye contact with him briefly. Because the perpetrator's ski mask had a very large eye opening, Antonaras was able to observe the color and character of his eyes, which were dark and bulging, and the shape of his eyebrows, which were arched. Antonaras also offered the following physical description of the perpetrator: African-American, between five feet, two inches and five feet, four inches tall, and weighing approximately 150 or 160 pounds.

At the conclusion of the hearing, the trial court denied the defendant's suppression motion, finding that, "there is not a scintilla of evidence that the court credits that would show anything suggestive in the [photographic] array shown to [Antonaras] or to the procedure utilized during her inspection of that [photographic] array. While unnecessary, in view of that finding, I will also find that, in the totality of the circumstances, the identification was overall reliable. The claims that the defense has go to the weight not the admissibility of the identification, which is another way for saying that that's grist for the jury's mill."

"[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . .

"Furthermore, [w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Citation omitted; internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 547–48, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

In accordance with these principles, we first address whether the identification procedure was unnecessarily suggestive. "Because, [g]enerally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect . . . [a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Citation omitted; internal quotation marks omitted.) Id., 548. To determine whether a photographic array is unnecessarily suggestive, a reviewing court considers various factors, including, but not limited to: (1) the degree of likeness shared by the individuals pictured; see *State* v. *Williams*, 203 Conn. 159, 175, 523 A.2d 1284 (1987) ("[w]hile the inclusion of lookalikes in a photographic array may enhance the reliability of the viewer's identification of a particular photograph, the failure to include lookalikes does not, in itself, render an identification procedure suggestive"); (2) the number of photographs included in the array; see *Simmons* v. *United States*, 390 U.S. 377, 383, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) (danger of misidentification "will be increased if the police display to the witness only the picture of a single

individual who generally resembles the person he saw"); *State* v. *Fullwood*, 193 Conn. 238, 244, 476 A.2d 550 (1984) ("[i]t has been generally recognized that the presentation of several photographs to witnesses, including that of the suspect . . . is by itself a nonsuggestive and constitutionally acceptable practice, in the absence of any unfairness or other impropriety in the conduct of the exhibit" [internal quotation marks omitted]); (3) whether the suspect's photograph prominently was displayed or otherwise was highlighted in an impermissible manner; *State* v. *Boscarino*, supra, 204 Conn. 726 ("[a]ny array composed of different individuals must necessarily contain certain differences [and] [d]ifferences in the size and color composition of photographs in and of themselves do not render an array . . . unnecessarily suggestive" [citations omitted; internal quotation marks omitted]); (4) whether the eyewitness had been told that the array includes a photograph of a known suspect; see *State* v. *Reid*, 254 Conn. 540, 556, 757 A.2d 482 (2000) ("It is proper for a court, in determining whether an identification procedure was unduly suggestive, to consider the fact that a police officer tells a victim that a suspect is in a photographic array. . . . Such a statement, however, is not enough to render an identification procedure unduly suggestive." [Citation omitted.]); (5) whether the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly; see *State* v. *Milner*, 206 Conn. 512, 535, 539 A.2d 80 (1988) ("[a]lthough we have recognized that pictorial recurrence can be suggestive in that it increases the risk of misidentification . . . the recurrent use of a defendant's photograph in successive arrays is not presumptively suggestive" [citations omitted; internal quotation marks omitted]); and (6) whether a second eyewitness was present during the presentation of the array. See *State* v. *Hafner*, 168 Conn. 230, 238–39, 362

A.2d 925 (second eyewitness was present during identification procedure, but she "did not say or do anything before, during, or after the complaining witness' identification to influence her selection"), cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975).

The defendant claims that the composition of the photographic array was unnecessarily suggestive because Antonaras recognized seven of the eight individuals depicted as patrons of Empire Pizza.[18] We reject this claim. The trial court reasonably could have inferred from Antonaras' testimony that, although she recognized the defendant, and six other individuals, as persons who had patronized Empire Pizza at some point in time during the restaurant's thirty year history at 861 New Britain Avenue, she personally was not familiar with any of them. See footnote 16 of this opinion. The defendant has failed to cite any authority, and we are aware of none, to support the proposition that the inclusion of individuals merely recognizable by, but not known to, an eyewitness, renders a photographic array unnecessarily suggestive. See *State* v. *Blackwell*, 86 Conn. App. 409, 415–16, 861 A.2d 548 (2004) (photographic array was not unnecessarily suggestive even though witness recognized three of eight men depicted), cert. denied, 272 Conn. 922, 867 A.2d 838 (2005). To the extent that the composition of the array might have led Antonaras to speculate that the police suspected that an Empire Pizza patron had committed the robbery, we note that this speculation would not have focused Antonaras' attention on the defendant, nor on any individual in particular, because the majority of individuals included in the array had patronized Empire Pizza at some point in time.

---

[18] The defendant does not claim, nor is there any evidence in the record to support the proposition that the police knew, or should have known, that the individuals depicted in the photographic array would be recognizable to Antonaras and Antonios Antonaras as patrons of Empire Pizza.

We further reject the defendant's claim that the pretrial identification had been conducted in an unnecessarily suggestive manner. The trial court reasonably could have found that the removal of the photographic array did not introduce an element of competition into the identification procedure, but, rather, enabled Antonaras to regain her composure and focus more intently on the task at hand. Additionally, the trial court reasonably could have found that Foley's suggestion to isolate the eyes of the individuals pictured did not suggest to Antonaras "that she was very close in her initial narrowing down of the eight photographs to two," but, rather, offered a more refined technique to compare the facial features of the individuals depicted with her own recollection of the masked perpetrator. Lastly, the defendant's insistence that Foley improperly impressed upon Antonaras "the need to make an identification from this particular photo[graphic] array" is contradicted by the testimony of Foley and Antonaras, which emphasized Foley's repeated instructions to look at each photograph slowly and carefully because it is "just as important to identify the innocent as it is to identify the guilty." Accordingly, we conclude that the pretrial identification procedure was not unnecessarily suggestive,[19] and that the trial court properly denied the defendant's motion to suppress.

The judgments are reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

___

[19] In light of this conclusion, we need not address whether "the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 548; see also *State* v. *Vaughn*, 199 Conn. 557, 565, 508 A.2d 430 (declining to address reliability of identification because photographic array was not unnecessarily suggestive), cert. denied, 479 U.S. 989, 107 S. Ct. 583, 93 L. Ed. 2d 585 (1986).